Filed 8/29/25  P. v. Haldeman CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RANDOLPH MICHAEL HALDEMAN,<br><br>        Defendant and Appellant. | A166803<br><br>(San Mateo County Super. Ct. No. 19SF010689A) |

In 2022, following an eight-day jury trial, defendant Randolph Michael Haldeman was convicted of 15 sexual offenses—including multiple counts of lewd act against a child and forcible lewd act against a child—against nine different underage victims, and sentenced to an indeterminate term of 165 years to life and a concurrent determinate term of 10 years, eight months. Haldeman makes 19 arguments on appeal, asserting various claims of instructional and evidentiary error, insufficient evidence, and numerous claims that his trial counsel provided ineffective assistance.  Finding no merit to any of his contentions, we affirm.

## BACKGROUND

On August 21, 2019, the San Mateo County District Attorney filed a felony complaint, and on May 6, 2021, the operative amended information, charging Haldeman with the following:  two counts of oral copulation by

1

anesthesia or controlled substance (Pen. Code[1], § 287, subd. (i))[2] of Peter Doe (counts 1 and 2); one count of sodomy by anesthesia or controlled substance (§ 286, subd. (i)) of Peter Doe (count 3); six counts of a lewd act on a child (§ 288, subd. (a)), of Oliver Doe (count 4), of Andrew Doe (count 5), of John Doe (count 6), of Michael Doe (counts 7 and 8), and Garrett Doe (count 16); seven counts of forcible lewd acts on a child (§ 288, subd. (b)(1)), the first three with respect to Robert Doe (counts 9–11), and the second four counts with respect to Ashley Doe (counts 12–15); and three counts of unlawful communication and contact with a minor with the intent to commit a sexual offense (§ 288.3, subd. (a)), with respect to Jane Doe (count 17), Jack Doe (count 18), and Eric Doe (count 19).[3]

Trial took place over approximately 8 court days in April and May of 2021.

As relevant to the various counts and arguments at issue on appeal, some of the testimony at trial was as follows.

**Peter Doe (Counts 1–3)**

In 1982, Peter Doe was eight years old and living in California with his mother after his parents' divorce. In 1983, his mother signed him up for the Big Brothers program. After his first big brother moved out of the area three

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    The information charged this count under former section 288a, subdivision (i), although that section was renumbered without substantive change and became section 287, effective January 1, 2019. (Stats. 2018, ch. 423, § 49.)

[3]    The information also alleged dates or date ranges for each of the offenses, with the earliest being counts 1–3 against Peter Doe between August 25, 1989 and August 24, 1990, and the latest being count 17 against Jane Doe on July 6, 2018.

years later—when Peter was 12 years old—he was paired with Haldeman through the program. At the time, Haldeman was unmarried and living in a house in Sunnyvale.

Although the relationship was "fun . . . to start off with," when Peter was 13 years old, it "changed," and "[t]here started to be talk about sexual things." On one occasion, Haldeman gave Peter a "full-body massage," and when Peter mentioned the massage to his mother over the phone while still at Haldeman's house, Haldeman told Peter " 'Maybe it's better not to say that. You know, she might get the wrong idea.' " On another occasion in Haldeman's bedroom, Haldeman gave Peter a lengthy explanation of "what he called the fluid dynamics of a man and how . . . after about a week's time . . . you need to release this fluid, semen." Peter also had a "fragmented recollection" of another incident in which Haldeman "expos[ed] himself near his bathroom" while Peter was visiting.

The next sexual incident occurred while Haldeman and Peter were watching TV on Haldeman's sofa. "[Q]uite out of the blue, [Haldeman's] hand went to [Peter's] crotch and [he] started to manipulate, touch, fondle [Peter's] genitals." Peter "became aroused," and Haldeman "start[ed] to open up [Peter's] shorts," although he "didn't go too much further than that." Peter did not see Haldeman "for a few weeks" after this incident. However, in February of 1988, Haldeman wrote Peter a letter apologizing "[i]f there is something I did or do that upsets you," and the relationship then resumed until Peter moved to Canada in September of 1988 to live with his father.

In October of 1989, shortly after he turned 15, Peter moved back to Menlo Park. At that time, Peter was doing "youthful experimenting, alcohol, Cannabis, and a little further into . . . 1990, some psychedelics." In the summer of 1990, after trying LSD for the first time, Peter went to

3

Haldeman's house because he "felt like [he] couldn't go home," and "rode out that experience" there, although nothing sexual happened at that time.

Peter and Haldeman "got into a routine of him bringing me over, having a nice meal," which also included Haldeman "having beer and starting to offer that to me after work and during our meal" and while watching a movie, "[a]nd it proceeded on to being a sleepover and that was also a frequent kind of thing."

At the time of the first charged incident, Peter "was being fairly buzzed, a good intoxication from having drunk alcohol there. And that's a combination of beer and this particular vodka [Haldeman] liked to keep in his freezer and having tried that and mixed drinks as well, a little bit of both." Peter and Haldeman "ended up . . . in [Haldeman's] room," "definitely feeling the effects." They laid down on the bed and were undressing. "There was . . . some talk of looking at each other and him talking about his penis and size," and Haldeman "did talk about the taste difference between preseminal fluid and semen." Haldeman "had also remarked and tasted mine at one point," there was "other touching on the bed," and after the lights were turned off, Haldeman "perform[ed] oral . . . sex on" Peter. Peter had a "feeling of being frozen," "stuck and not able to really express . . . that I wasn't exactly enjoying that." As to his level of intoxication during this incident, Peter testified as follows:

"Q. You said that you had had enough to drink where you felt intoxicated.

"Do you remember exactly how much you had to drink?

"A. I believe like at least two beers and a mixed drink and as well, a shot.

"Q. Okay. And were you used to drinking at that point in your life?

4

"A. No. I had—I had a misadventure with it in Ontario. I wasn't drinking frequently, no."

And:

"Q. Okay. And do you remember feeling like—how do you remember feeling? How did your body feel when this incident was happening?

"A. With the lights still on and, you know, all of that and throughout the whole thing, I, you know, was feeling kind of relaxed and just, you know, loosened up, like, you know, a lowered inhibition feeling of, you know, buzzed for sure and just, you know, that kind of sensation of, you know, intoxicated, not excessively, but . . ."

"[W]ithin a week or two," Peter had another sleepover with Haldeman. Peter's "main memory" was of "being in the bed in the dark for that one and a similar feeling to before, having—you know, having had a few drinks, a few beers before. And [Haldeman] started to perform oral sex again." The incident "proceeded to . . . [Haldeman] masturbating [Peter] to climax." Peter had a "similar" feeling as he had had during the first incident of being frozen and unable to express that he did not want the experience to continue, "except that . . . I just kind of made a way of saying—or kind of pulling away from him and . . . there wasn't really a comment so much beyond that."

The third incident took place "within a couple weeks, two, three weeks," with "a similar kind of routine of coming over for dinner and a movie and ending up" in Haldeman's bed, with the "usual of drinking a little bit." Peter was "laying on that side of the bed and kind of pushed towards [Haldeman] . . . [a]nd . . . [Haldeman] started to get aroused; started having lubrication," and "started to push." There was "brief penetration" of Peter that "didn't last very long," during which Peter felt "not good" and "uncomfortable." The penetration "stopped pretty quickly," and Haldeman

5

said " 'I don't want to hurt you.' "  Haldeman "finish[ed] himself off . . . [m]asturbating in his toilet in the master bedroom."  Before this third incident, Peter had "two or three beers," but "[n]ot vodka at that time," and again had the "feelings of a lower inhibition, being buzzed, being relaxed."

On redirect examination, Peter explained:

"Q.  You said that there was a disassociated feeling that you had when you were being sexually assaulted.

"Was that due to alcohol?

"A.  Yes.  And also like just a feeling from before that I've had with him.  The combination of the two, going into that state when I was 13, plus the combination of alcohol, too.

"Q.  Okay.  Would it have been easier to resist if you had not been drinking alcohol?

"A.  Yes.  I would have had a better sense of, you know, the surrounding or the situation.  It was—it added to this sense of confusion of being led along through this experience again at a different level, at a different time.

"Q.  Did the drinking affect your reasonable judgment?

"A.  In my opinion, yes.

"Q.  And we're talking about all three times?

"A.  Yes.

"Q.  And last question:  Did you ever have a hangover after one of the three incidents where you had alcohol to drink or after all of them?

"A.  Yeah.  I definitely had a noticeable hangover after one of them, yes.

"Q.  Which one was that, if you remember?

"A.  I'm quite sure it was the first one.

6

"Q. What about the other two? Did you not have a hangover, or was it just not as noticeable?

"A. Not as noticeable."[4]

**Robert and Ashley Doe (Counts 9-13)**

Michael, Robert, Ashley, and Edward Doe are siblings. In the summer of 1997, when Robert was 10 years old, they moved in with their grandmother in Menlo Park across the street from Haldeman.

**Robert (Counts 9-11)**

At the time Robert moved in with his grandmother, he had "very little" contact with his parents, and he described himself as "very vulnerable" because his "dad wasn't around." From the "very beginning . . . [Haldeman] was kind of like a big brother," and he thought that Haldeman's "friendship was key . . . because he was very welcoming, very polite, . . . very friendly," and "knew a lot of people." Robert and Haldeman went boogie boarding, coached Haldeman's daughter's basketball team, went to the movies, played sports, and went on "regular stroll[s]" together. Robert had fun with Haldeman and cared for him "[a]s a friend."

About six to nine months after Robert moved in with his grandmother, Haldeman began tutoring him in history and math. The tutoring sessions took place in Haldeman's office at his home, and Robert and Haldeman were typically alone.

---

[4] When asked by the trial court what he meant by "disassociation," Peter explained: "Like very and most noticeably was the first time when I was molested, basically, in the Sunnyvale home. And it's a feeling of being very warm and like overall kind of frozen and just a little bit like I can't really react and/or, you know, get into a space of making a decision of action, of being stuck."

7

After their second tutoring session, Robert and Haldeman "started talking about women and the stuff I was interested in. And all of a sudden, he busts out his Zip drive, plugs it in, types in his password, and it pops up some pornography and [it] starts . . . playing." Haldeman "started touching [Robert] on the outside" of his pants, telling Robert " 'It's okay. Just relax. Enjoy the moment.' " Robert felt "[v]ery nervous and uncomfortable." Haldeman then pulled Robert's penis out of his pants "and started licking it." Haldeman also licked Robert's testicles. Robert "got uncomfortable, and [he] left." Robert did not tell anyone about the incident, because "I felt ashamed of myself. I felt demoralized, you know, growing up with an old-fashioned . . . grandmother who teaches you morals, and then, you know."

A couple months later, Robert returned for another tutoring session. Robert "didn't want to go . . . but my grandmother made me because . . . she thought it was best for me obviously to improve my grades." After the tutoring session ended, "the same stuff happened"—Haldeman "pulled out his Zip drive; plugged it in; typed in his little password; played the pornography; gave me alcohol as well to kind of help me relax, Southern Comfort and Sprite."[5] Robert had two drinks made by Haldeman, and the two again watched pornography together. Haldeman then "got down on his knees underneath the desk and proceeded to touch me. He then pulled out my penis and my scrotum and proceeded to lick it." Robert "was a little drunk and kind of embarrassed" and "got uncomfortable." Haldeman told Robert: " '[P]lease don't tell anybody. It would ruin my reputation.' " Robert "literally left and walked out the door." He did not tell anyone about the

---

[5] Robert recalled that he also had "one drink" during the first incident.

8

incident because he was "extremely ashamed of myself" and "felt as if really nobody would believe me."

In 1999, Robert moved to Washington state to live with his mother. His decision to move was prompted by the fact that "at least once a week, if not twice a week" "there would be nights when [Haldeman] would go through the backyard and knock on the window that I was—the room I was living in and ask me, 'Hey, can you come to the hot tub? Hey, do you want to come to the hot tub? Do you want to come hang out?' You know, randomly. It was eleven o'clock at night. I'm getting ready to go to bed."

In 2000, during Robert's sophomore year of high school, he moved back in with his grandmother in California.

When Robert was 16 years old, Haldeman took him to San Antonio to see the NCAA Final Four, and the two stayed together in a hotel room. Haldeman "supplied alcohol the whole entire trip," and Robert was "drunk the majority of the time." One night, Haldeman and Robert "were watching pornography," and Haldeman "went down and literally just forced himself on me," "trying to force oral upon me." Robert "wasn't interested" and "forced [Haldeman] off me because I felt very awkward." He went into the bathroom, locked the door, and spent the night there. The two left San Antonio the next day. Robert did not tell anyone about the incident because "[o]nce again, I was shameful. I was scared, to be honest with you. The only one I really had to confide in was my grandmother. If I told my grandmother, being old-school, she would probably kick me out, and I would have been homeless, you know. So that's—[¶] I'm sorry."

**Ashley Doe (Counts 12–15)**

Ashley was seven years old in 1997 when she and her siblings moved in across the street from Haldeman.

On one occasion when Ashley was about eight years old, she was in Haldeman's hot tub with Haldeman and her brother Michael late at night. Haldeman "would have us touch his penis and tell us, 'It's okay. Nothing is going to happen. Don't worry.'" Both Ashley and Michael touched Haldeman's penis. This happened a total of five times between 1998 and 1999. Ashley let Haldeman do this because "I was manipulated. It was comfortable. He manipulated me." She did not tell anyone about the incidents because she "was scared" of her "family being hurt"—"[j]ust physically, emotionally, mentally. I . . . didn't want my family hurt."

On another occasion, Haldeman, Ashley, and Michael were in Haldeman's office and he "put his penis in [Ashley's] mouth" and took photographs of it. On this occasion, Haldeman also ejaculated. Haldeman put his penis in Ashley's mouth and took photographs four more times between 1998 and 1999.

Ashley did not tell anyone about the incidents because she "was scared" and "didn't know what was right and wrong at the time." She also felt like she "had to do it because an adult was telling [her] to do it."

**Oliver Doe (Count 4)**

During the summer of 2008, when Oliver Doe was eight years old, he spent "nearly every day" at the Ladera Recreation Center. He met Haldeman "through swim team, through events at the recreation center," and "playing

volleyball games." Haldeman was "very nice," with a "childlike personality," and he was "always" at the rec center.

One day that summer, after swim team practice, Oliver and Haldeman went into the bathroom and then into a shower stall together. Haldeman's "penis was erect" and he "put soap on it," then told Oliver "[t]o wash it" in a "childlike" and "encouraging" voice, "the way you talk to a kid or . . . a dog." Haldeman "began to show how to do it" by "emulating jerking off." Oliver "did it, and then just proceeded to wash it, emulating jerking off." [6]

Oliver's mother testified that later that evening, Oliver told her what had happened:

"Q. Okay. What do you remember—how do you remember learning about the incident?

"A. Well, I was in the apartment bathroom. And Oliver, you know, came to me and basically said that Randy asked him to wash his penis."

And:

"Q. What was the total—totality of what he shared with you?

"A. Well, you know, he said that—anyway, I vividly remember it in my mind, the description. He said he was up at the pool in the men's shower and Randy was there with him. And Randy pulled open his s[h]orts. His penis was erect. And Randy asked him to put shampoo on it."

Oliver's mother and father then "asked the obvious questions":

"Q. What were the obvious questions?

---

[6] When Oliver was a freshman in college, he reported an unwelcome sexual advance from another student to the authorities at his school, and they "asked if [he] had any previous exposure to an assault, molestation, anything of a similar nature." Oliver told the school about the incident with Haldeman, and in January 2019 they reported the incident to the San Mateo Police Department, which report ultimately led to Haldeman's arrest.

"A.  The obvious questions were, did you—'Did he ask you to touch it,' and he said, 'No.'  'Did he do anything—you know, did he touch yours?'  He said, 'No.'  'Did he do anything else?'  He said, 'No.'  'Did this happen before?'  He said, 'No.'  But everything was no, no, no, no.  But we—we assumed we had nipped it in the bud which we think we did, but . . ."

Oliver's parents did not contact the police because they "believed that there was no touching," they "had no idea if putting [their] son through an interrogation or trial—what effect that would have on him," and they were unsure "if anybody would believe an eight-year-old versus a grown man" who was a "fixture at the pool."  But they did "things other than going to the police to protect our son in the neighborhood."  In particular, Oliver's mother told Diane Gow, who was an "authoritative figure" at the Ladera Rec Center, "so that they were aware and could also keep an eye out on [Haldeman]."

Oliver's father testified regarding the incident that "we went to the pool that particular weekend, a weekend during the summer.  And after returning to the pool, my son reported to my wife that [Haldeman] invited Oliver into the shower at the Ladera Rec Center and asked him to—to squirt shampoo on his penis, his erect penis."  According to Oliver's father, "[t]he only information that I had was what was reported to me by my wife.  So he was in the shower at the time in the apartment, and my wife had—the conversation, as it was related to me by my wife, was that Oliver said, 'Why is dad's penis not big like Randy's penis?'  And so she asked a bunch of questions to try to figure out what happened, and—and she came out and told me what—what the conversation was about, and then I asked Oliver many of the same questions."

And:

"Q. And what did you do, if anything, upon learning the information that you had from Oliver?

"A. My recollection was—and, again, this was 13—12, 13 years ago—was that I asked Oliver the same sorts of questions, 'Did you touch his penis? Did he touch you? Did anything else happen? Had this ever happened before? [¶] And Oliver's answers to that were 'No.' "

Oliver's mother and father decided not to tell the police because "it could potentially be more damaging to him long-term" to have to testify at a trial at the age of eight. However, Oliver's father confronted Haldeman at the pool, told him "Oliver told me what you . . . did to him," that it was "absolutely disgusting," that "I don't want you to ever come anywhere near my family" or Oliver again, and that if Haldeman did, "I would fucking kill him."

In the summer of 2008, Diane Gow was the president of the board of directors at the Ladera Rec Center. She testified that around that time, Oliver's father "told me that his son had told him that he had been in the shower with Randy and that Randy had asked him to—no, that Randy had pulled open his bathing suit and asked his son to squeeze shampoo in there." Gow did not call the police or take any other action at the time because Oliver's father "was adamant that he had taken care of the situation and that he didn't want anything further" and because she "didn't think that having a kid squeeze shampoo in your bathing suit was something to call the police about."

13

**Garrett Doe (Count 16)**

While Garrett was growing up, his older sister was close friends with one of Haldeman's daughters, and on a few occasions, the two families got together.

One night when Garrett was seven years old, the two families had dinner together at Haldeman's house. Before dinner, Haldeman was in the hot tub with Garrett and some of the other children. After they left the hot tub, Garrett testified that Haldeman "took me to one of the bathrooms in the house and had me take a shower with him." When they left the hot tub, Haldeman and Garrett were wearing swimsuits.

According to Garrett, "[o]nce I was in the bathroom, eventually we were both in the shower, neither of us wearing clothes. I remember at some point he was squirting soap, and then he also—I remember him talking about cleaning genitals." Garrett remembered Haldeman squirting soap "around my chest area," but testified that "[h]e did not physically touch me in the shower." At that time, Garrett had "pretty significant speech and motor and coordination issues," such that it would have been "doable but difficult" for him to dress himself after taking a shower. Garrett did not remember the shower, but when shown a picture of it—which the prosecutor described as a "step-down shower/tub combo-type fixture"—he testified that "[i]t would have been difficult" for him to get into the shower by himself, and he "[m]ost likely" would have needed assistance to do so.

Garrett's mother testified as follows:

"Q. Was there a particular incident that occurred at the defendant's house that changed your relationship with him?

14

"A. Yes. We were at their house for dinner. And the children were outside playing. And Randy went outside to be with the children. And they went in the hot tub. They were in their swimsuits.

"And after a while—it was before dinner, I believe—Randy and Garrett came in. And Randy said, 'Is it okay if we rinse off?' And I assume there was chlorine in the hot tub or chemicals, and they were just going to rinse off in the shower. And I'm like, 'Yeah, okay.'

"And so we were in the living room. And they went off to a bathroom, I believe, on the first floor. And I even could hear the shower go on. And so I assumed they were just going to rinse off with their bathing suits on. And they were in there longer than I expected. I started to—I became uneasy.

"And I was about to get up and knock on the door, and they came out. And when they came out, Garrett was fully dressed in his shorts and top, and his hair was combed. And it just made me—made my radar go off. And, so, yeah.

"And then subsequently, when we came home from dinner and I was getting Garrett ready for bed, I was very concerned about them being in the shower so long, and yet I didn't want to alarm Garrett who was young, and I didn't want him to feel like he had done anything wrong.

"So I just calmly asked him, I said, 'Garrett, when you were in the shower with Randy, did you have your swimsuits on or were you nakey?' And he said, 'We were nakey.'

"And my heart dropped. And then I asked him, you know, calmly, you know, 'Well, did you play any games in the shower?' And he said, 'Yes. We squirted each other with soap.' And I said, 'Okay.' And he said, 'Yeah. We squirted each other's private parts with soap.' And I said, 'Did you touch Randy? Did Randy touch you?' And he said, 'No.'

15

"So I put him to bed. And I immediately went out and told my husband. And we made a pact that we were going to keep Garrett away from Randy.

"We, at the time, didn't know whether what had transpired—everything that had transpired, whether it was actionable, but we knew we had to protect him because what happened was minimally inappropriate. And so we distanced ourselves from Randy and the family. We still would run into them. We lived in the same neighborhood, but we made a point of never having Garrett alone with Randy again."

Garrett's mother also testified that because Garrett had "some early developmental delays," he was "a little clumsy," and she "usually helped him" dress himself. When asked whether it was unusual for Garrett to comb his own hair without help, Garrett's mother replied, "Oh, he did not comb his own hair. Trust me."

A couple weeks after the incident, Haldeman called Garrett's mother and "wanted to know if Garrett would come over for a sleepover." Haldeman said his wife and older daughter were away, and thought a sleepover "would be fun for his younger daughter who was two years younger than Garrett, and Garrett . . . hardly even knew her." Garrett's mother said that Garrett was not available, but thought the request was "really strange."

**Jack Doe (Count 18)**

In the summer of 2015, when he was seven years old, Jack joined the Ladera Recreation Center's swim team. For the championship dinner at the end of the season, Haldeman made "an incredible video of all the kids swimming," which Jack's mother thought was "really good." Jack's mother introduced herself to Haldeman and thanked him for making the video. A few months later, Jack's mother ran into Haldeman, reintroduced herself to him, reminded him of Jack's name, and began a friendly conversation. When

she "let [Haldeman] know that [she] was a single mom," "all of a sudden the conversation turned and, without missing a beat, he tried to ask me to get Jack to come over to his house to help him with chores and projects that he had." Jack's mother was "shocked," found this "alarming," and "something didn't sit right" with her. She "responded that we were always busy and kind of tried to slow the conversation down and be done with it."

On two separate occasions, Haldeman stopped by Jack's house when Jack's mother was not home. The first time, "there were cookies and strawberries" on her doorstep with a sticky note saying Haldeman "was thinking about us," "[i]t was a beautiful day," and he got the strawberries "from the farmer's market and hoped I would enjoy them." The second time, two to four weeks later, Haldeman again left a basket of cookies at Jack's mother's front door.

On December 4, 2016, Haldeman sent an email to Jack's mother thanking her "talking about how he drives past my house ten times per week and is trying to basically see if we're ever out in the front so he can stop by and say 'hi' and also that he likes the Christmas decorations and to say 'hi' to Jack for him."

On December 29, 2018, Haldeman again emailed Jack's mother, thanking her "for always decorating [her] house," "reminding me where he lives," and "guessing how old Jack is now and what grade he's in and, again, asking me to have him come over to his house to help him with chores," and telling her "how much he would pay him and that he's building something in his backyard."

Both emails were admitted into evidence.

17

**CSAAS Evidence**

Miriam Wolf, a forensic interview specialist and the director of the forensic interviewing program for San Mateo County, testified for the prosecution as an expert in child sexual abuse. Wolf testified that she did not know anything about the facts of the case and was testifying about child sexual abuse accommodation syndrome (CSAAS) "as a concept." She briefly described the five categories of behavior that a child sexual abuse victim may or may not experience: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction. She explained that she was not testifying "to provide an opinion as to whether any of the victims in this case had been sexually molested," but rather, because "there's a lot of misunderstandings about the dynamics of how children experience and report child sexual abuse," and "some of this information can help the jury evaluate . . . information" as "a way of correcting some of the misunderstandings around child sexual abuse." On cross-examination, Wolf agreed that "CSAAS is not a scientific tool to establish if a charge of child molestation is true."

**Haldeman's Testimony**

Haldeman testified at length in his own defense, denying all the charges against him and providing alternate versions of the charged incidents.

**Verdict and Sentence**

On May 10, 2021, the jury found Haldeman guilty on counts 1–13, 16, and 18, and not guilty on counts 17 and 19.[7] The jury was unable to reach a

---

[7]     As to counts 1–3, the jury found true the special allegation that the statute of limitations had been extended (§ 803, subd. (f)(1)) and that Haldeman occupied a position of special trust and committed an act of substantial sexual conduct (former § 1203.066, subd. (a)(9)). As to counts 4–13 and 16, the jury found true the special allegation that Haldeman

18

verdict on counts 14 and 15, as to which the trial court declared a mistrial and which were subsequently dismissed on the prosecution's motion.

On May 13, 2022, Haldeman moved for a new trial, which motion was denied after a hearing held on August 26 and September 9.

On November 22, the trial court sentenced Haldeman to an indeterminate term of 165 years to life in prison, calculated as follows: 15 years to life on each of the 11 counts of lewd act on a child (counts 4–13 and 16), based on the jury's true findings under section 667.61, subdivision (e) that the offenses involved multiple victims. (See § 667.61, subds. (c)(4) & (8), (e)(4).) The trial court found that "each of these counts either involved separate victims or acts committed against the same victim on separate occasions . . . based on the evidence heard at trial and summarized in the People's sentencing memorandum," and therefore ordered that the sentences run consecutively. (See § 667.61, subds. (d)(2) & (i).)

With respect to the determinate term (counts 1–3 and 18), the trial court found the offenses were separate crimes committed at separate times and places, and thus ordered that the sentences run consecutively under California Rules of Court, rule 4.425(a)(3). The court imposed the midterm of 6 years on count 1; one-third the midterm, i.e., 2 years, on counts 2 and 3; and one-third the midterm of 3 years, i.e., 8 months, on count 18; for a total determinate term of 10 years, 8 months, to run concurrently with the indeterminate term.

Haldeman filed a notice of appeal.

---

committed a lewd act on a child against more than one victim (§ 667.61, subds. (b) & (e)(4)). And as to count 4 and counts 9–13, the jury found true the special allegation that Haldeman had substantial sexual conduct with the victim, a child under the age of 14 years (§ 1203.066, subd. (a)(8)), but found this special allegation not true as to count 16.

**DISCUSSION**

Haldeman raises 19 arguments on appeal: (1) substantial evidence does not support the jury's finding that Peter was intoxicated to the point of being legally incapable of resisting with respect to counts 1–3; (2) the trial court erred in sustaining the prosecutor's objection when Peter was asked if he understood the moral component of engaging in a sexual act; (3) trial counsel was ineffective in failing to object to certain alleged hearsay statements in connection with count 4; (4) substantial evidence does not support the jury's finding that Haldeman used force or duress with respect to counts 9–13; (5) substantial evidence does not support the jury's verdict on count 16; (6) trial counsel was ineffective in failing to object to certain hearsay statements with respect to count 16; (7) substantial evidence does not support the jury's finding of intent with respect to count 18; (8) the trial court erred in instructing the jury it could rely on Haldeman's other sexual offenses as propensity evidence with respect to count 18; (9) trial counsel was ineffective in failing to object and request an admonition regarding that same propensity evidence; (10) trial counsel was ineffective in failing to object to the admission of certain statements Haldeman made to his sister on the ground of attorney-client privilege; (11) trial counsel was ineffective in failing to object to the prosecutor's statement in closing argument that Haldeman had admitted to touching the victims; (12) trial counsel was ineffective in failing to call character witnesses; (13) the prosecutor diluted the reasonable doubt standard of proof in closing argument and trial counsel's failure to object to the same was ineffective assistance; (14) the prosecutor committed misconduct by calling Haldeman a "monster" in closing argument and trial counsel was ineffective in failing to object to the same; (15) the trial court erred in instructing the jury with CALCRIM No. 1193 because it allows the

jury to use CSAAS evidence to assess credibility; (16) cumulative error; (17) the trial court's findings that the offenses were committed on separate occasions or involved separate victims violated Haldeman's Sixth Amendment right to trial by jury; (18) the jury's finding that Haldeman occupied a position of special trust under former section 1203.066 with respect to counts 1–3 must be vacated because that provision is no longer the law; and (19) the minute order of May 10, 2021 must be corrected.

### 1. The Jury's Verdict on Counts 1–3 Is Supported By Substantial Evidence

As noted, Haldeman was convicted on counts 1 and 2 of oral copulation by controlled substance (former § 288a, subd. (i))[8] and on count 3 of sodomy by controlled substance (§ 286, subd. (i)), both of which require that "the victim is prevented from resisting by an intoxicating or anesthetic substance, or any controlled substance." (§§ 286, subd. (i), 287, subd. (i), former 288a, subd. (i).) And so the jury was instructed, pursuant to CALJIC No. 10.13, that one element of the crime was that the victim "was prevented from resisting such act [of oral copulation or sodomy] by an intoxicating substance." The instruction continued:

"The words the person was prevented from resisting such act by any intoxicating substance mean that the person is not capable of giving legal consent because of intoxication from the substance in question. Legal capacity is the ability to exercise reasonable judgment, that is, to understand and weigh not only the physical nature of the act but also its moral character and probable consequences. In determining this issue, you should consider all the circumstances including, but not limited to, the alleged victim's age and maturity. It is not enough that the alleged victim was intoxicated to

---

[8]    As noted, former section 288a is now section 287.

21

some degree, or that the intoxication reduced the alleged victim's sexual inhibitions.  Impaired mentality may exist and yet the individual may be able to exercise reasonable judgment with respect to the particular matter presented to his or her mind."

In evaluating Haldeman's claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]"  [Citation.]  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87; see *People v. Waqa* (2023) 92 Cal.App.5th 565, 576.)

And where " 'the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; see *People v. Brown* (1984)

150 Cal.App.3d 968, 970 [in addressing sufficiency of the evidence "[i]t is of no consequence that the [fact finder's] believing other evidence, or drawing different inferences, might have reached a contrary conclusion"]; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490 ["Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence"].)

Here, there was substantial evidence in support of the jury's conclusion that Peter was "prevented from resisting by an . . . intoxicating substance."

In particular, before the first incident, Peter had "at least two beers and a mixed drink and . . . a shot," and was "definitely feeling the effects." Peter—who was 15 years old—was not "used to drinking" at the time, nor was he "drinking frequently." He testified that he was "buzzed for sure" and "intoxicated," and had a hangover afterwards. During the second incident, Peter had "a similar feeling to before, having . . . had a few drinks, a few beers before." And before the final incident, Peter had "two or three beers." During each incident, Peter had a "disassociated feeling" of being frozen and unable to express that he did not want the experience to continue, a feeling that he attributed to the alcohol, and he testified clearly that the drinking affected his "reasonable judgment" and that it "[w]ould . . . have been easier to resist if [he] had not been drinking alcohol." Given all this, and viewing the evidence in the light most favorable to the judgment, substantial evidence supports the jury's conclusion that Peter was "prevented from resisting," in the sense that the alcohol "prevented him . . . from exercising judgment."

In arguing to the contrary, Haldeman's brief engages in an extensive discussion of Peter's testimony in the light most favorable to his position, noting that Peter "voluntarily drank alcohol," "was able to walk up the stairs," "made the choice to touch Haldeman's penis 'based on the

23

relationship and rapport that had already been established,' " "voluntarily returned to Haldeman's home for the subsequent incidents," and so on. But this argument ignores the standard of our review. "Whether the victim possessed sufficient mental capacity to give legal consent despite [his] intoxication is a question of fact for the jury" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 470 (*Giardino*)), and because their conclusion is supported by substantial evidence, "[i]t is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown*, *supra*, 150 Cal.App.3d at p. 970.)

Haldeman's reliance on *Giardino*, *supra*, 82 Cal.App.4th 454 is unavailing. There, the defendant was charged with rape and oral copulation, both by intoxication (§§ 261, subd. (a)(3), former 288a, subd. (i)), and the jury was instructed that one of the elements of rape by intoxication was that " '[t]he alleged victim was prevented from resisting the act by an intoxicating substance . . . .' " (*Giardino, supra,* 82 Cal.App.4th at pp. 458–459, 464.) During deliberations, the jury asked the court for the legal definition of "resistance," and the court responded, with agreement of defense counsel, that " '[t]his is an area in which you must use your common sense and experience to determine the everyday meaning of resistance.' " (*Id*. at p. 464.) *Giardino* held that this response was error, because the meaning of " 'prevented from resisting' in this context is not clear. . . . [A]lthough the statutory language suggests that the factual issue is whether the intoxicating substance prevented the victim from physically resisting, the correct interpretation focuses on whether the victim's level of intoxication prevented him or her from exercising judgment." (*Id*. at p. 466.) *Giardino* went on to give a definition of "prevented from resisting" using language similar to that now included in CALJIC No. 10.02 and CALJIC No. 1.23.2, emphasizing that

24

the focus should be on whether the victim was capable of exercising reasonable judgment. (*Giardino*, *supra*, 82 Cal.App.4th at pp. 466–467.) Giardino went on the conclude that the instructional error was not harmless, because there was evidence supporting both the conclusion that the victim was capable of exercising reasonable judgment and the conclusion that she was not. (*Giardino*, *supra*, 82 Cal.App.4th at pp. 470–471.) Not so here, where the jury was properly instructed on the issue of intoxication and substantial evidence supports their finding that Peter was intoxicated such that he was incapable of exercising reasonable judgment.

### 2. Haldeman's Right to Cross-Examination Was Not Violated During Trial Counsel's Questioning of Peter Doe

While trial counsel was cross-examining Peter Doe, the following exchange took place:

"Q. And you understood at this point that you were engaging in sexual conduct with Randy; true?

"A. I was aware that this was happening and not that I was actively thinking of it in those terms.

"Q. You fully understood the physical nature of the act; that is, you understood that he is performing a sexual act upon you. You knew that; correct? . . . [¶]

"THE WITNESS: At one level, yes, and at another level, it was a—it was following a pattern of behavior based on our relationship and previous experience.

"BY MR. SMITH [trial counsel]:

"Q. You understand that whether it's having sex with a girl or woman or having sex with a man, there's a moral component to it. In someone's own value system, they make a decision whether they want to do this sexual act.

25

Are you following me?

"MS. SAMANT [prosecutor]:  Objection; vague, ambiguous, relevance.

"THE COURT:  Yeah.  In terms of the moral, sustained.

"Could you rephrase?

"BY MR. SMITH:

"Q.  Okay.  After you ejaculated and you pushed his head away, was there any discussion between the two of you about what had just occurred?

"A.  I don't—I don't remember."

Haldeman argues that because unlawful oral copulation by intoxicating substance required the prosecution to prove that "the person is not capable of giving legal consent because of intoxication from the substance in question," and the instructions told the jury that "[l]egal capacity is the ability to exercise reasonable judgment, that is, to understand and weigh not only the physical nature of the act but also its moral character and probable consequences," the trial court violated his Sixth Amendment right to cross-examine the witnesses against him by sustaining the prosecutor's objection to the question at issue, thus "precluding [him]" from "question[ing] Peter on his ability to assess the moral character of the encounters."

Haldeman's argument fails because it begins from a false premise.  The trial court did not exclude evidence regarding the moral character of the act, nor did it "preclud[e]" trial counsel's line of questioning regarding the same.  Instead, it simply sustained the prosecutor's objection to the way trial counsel initially phrased the question, including on the grounds that it was vague and ambiguous—which it plainly was—and expressly invited trial counsel to "rephrase" the question.  Counsel chose not to do so, instead moving on to a different line of questioning.  There was no violation of Haldeman's Sixth Amendment right to cross-examine Peter Doe.

Anticipating that trial counsel forfeited his argument by failing to accept the trial court's invitation to rephrase the question, Haldeman argues in the alternative that he received ineffective assistance of counsel.

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] . . . If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' ([*People v.*] *Ledesma* [(2006)] 39 Cal.4th [641,] 745–746; see *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)" (*People v. Bell* (2019) 7 Cal.5th 70, 125–126.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more

27

appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

In attempting to carry his burden to demonstrate prejudice, Haldeman points to two isolated portions of Peter's testimony, namely his response of "Yes" when asked whether he "made what [he] felt was a reasonable judgment" to take his clothes off before the first incident because he "was feeling perfectly comfortable at that time," and his testimony that he "made a choice [to touch Haldeman's penis] based on the relationship and rapport that had already been established and was continuing." He then asserts, without explanation, that "it is reasonably possible that additional testimony from Peter that he understood the moral component of his engagement in sexual conduct would have tipped the scales in the defense's favor." This is insufficient, because it is nothing but speculation as to how trial counsel might have rephrased the question at issue, how Peter would have answered it, and how the jury might have considered that answer, especially in light of Peter's testimony regarding how his level of intoxication affected his judgment—testimony evidently credited by the jury—that we have already discussed. (See *People v. Williams* (1988) 44 Cal.3d 883, 937 [defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel"].)

### 3. Trial Counsel Was Not Ineffective In Failing to Object to Alleged Hearsay With Respect to Count 4

Haldeman argues that his trial counsel was ineffective in failing to object to three statements that he alleges were hearsay in connection with count 4 regarding Oliver Doe: (1) Oliver's mother's testimony that Oliver "basically said that Randy asked him to wash his penis" and "said he was up at the pool in the men's shower and Randy was there with him. And Randy pulled open his s[h]orts. His penis was erect. And Randy asked him to put

28

shampoo on it"; (2) Oliver's father's testimony that "my son reported to my wife that [Haldeman] invited Oliver into the shower at the Ladera Rec Center and asked him to—to squirt shampoo on his penis, his erect penis"; (3) Gow's testimony that Oliver's father "told [her] that his son had told him that he had been in the shower with Randy and that Randy had asked him to—no, that Randy had pulled open his bathing suit and asked his son to squeeze shampoo in there."

As noted, at trial, Oliver testified that after entering the shower together, Haldeman [was erect] and told him to "wash it . . . the way you talk to a kid or . . . a dog," "very encouraging," and that "[h]e began to show how to do it, and then I—I did it, and then just proceeded to wash it, emulating jerking off."

As our Supreme Court recently observed, " 'except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal,' especially where 'the alleged incompetence stems from counsel's failure to object.' " (*People v. Jasso* (2025) 17 Cal.5th 646, 676; see *People v. Castaneda* (2011) 51 Cal.4th 1292, 1335 ["The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel"]; *People v. Riel* (2000) 22 Cal.4th 1153, 1202 [trial counsel has no "duty to object simply to generate appellate issues" and "[s]ometimes, the best action an attorney can take regarding an available objection is not to make it"].) And this rule applies with equal force "even when there was a basis for objection." (*People v. Majors* (1998) 18 Cal.4th 385, 403.)

Haldeman's briefing on this issue is conclusory and self-contradictory. The sum total of his argument that trial counsel's failure to object to the

alleged hearsay statements was deficient performance is his bald assertion that "[t]he hearsay evidence introduced by the prosecution served only to corroborate Oliver's allegations." Not so. Indeed, in arguing that the failure to object was prejudicial—on the very same page of his brief—Haldeman goes on to explain that "[t]ouching is a requisite element of the offense of lewd and lascivious conduct under section 288, subdivision (a)" and "Oliver's allegation that he stroked Haldeman's penis was contradicted by the testimony of both of his parents, who testified that Oliver had said that he did not touch Haldeman's penis and that Haldeman did not touch Oliver's penis." Thus, as Haldeman's brief itself explains, trial counsel plainly had a tactical reason for not objecting to each of the alleged hearsay statements: they were inconsistent with Oliver's trial testimony in a way that cast doubt on one of the elements of the charged offense. And—again as Haldeman's own brief acknowledges—on cross-examination, trial counsel attempted to cast doubt on Oliver's testimony by asking him about his prior inconsistent statements to his parents,[9] not only demonstrating that counsel's decision not to object was a tactical one, but also potentially rendering those statements admissible under Evidence Code sections 770 and 1235.[10] Haldeman has failed to carry

---

[9]    "Q. All right. But what you told your parents was—you did not tell your parents that you ever touched his penis; isn't that true?

"A. I don't remember.

"Q. All you told your parents was you squirted shampoo on Mr. Haldeman's penis; isn't that true?

"A. I don't recall what I told my parents.

"Q. Were you telling your parents the truth?

"A. Yes."

[10]    (See Evid. Code, §§ 1235 ["Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent

30

his burden to show that there "simply could be no satisfactory explanation" for trial counsel's failure to object to the alleged hearsay statements. (*Mai, supra*, 57 Cal.4th at p. 1009.)

### 4. Substantial Evidence Supports the Jury's Finding of Duress or Fear With Respect to Counts 9–13

Haldeman was convicted of forcible lewd acts against a child (§ 288, subd. (b)(1)) with respect to Robert in counts 9–11, and with respect to Ashley in counts 12 and 13. Section 288, subdivision (b)(1) punishes any person who commits a lewd act against a child "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim." (§ 288, subd. (b)(1).) And the jury was instructed, pursuant to CALCRIM No. 1111, that one element of the offense is that "[i]n committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else," and:

'The *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself.

"*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and his or her relationship to the defendant.

"*Retribution* is a form of payback or revenge.

---

with his testimony at the hearing and is offered in compliance with Section 770"], 770, subd. (a) [extrinsic evidence of prior inconsistent statement shall be excluded unless "witness was so examined while testifying as to give him an opportunity to explain or to deny the statement"].)

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"An act is accomplished by *fear* if the child is actually and reasonably afraid or he or she is actually but unreasonably afraid and the defendant knows of his or her fear and takes advantage of it.

"It is not a defense that the child may have consented to the act."

In closing argument, the prosecutor argued that Haldeman committed counts 9–15 against Robert and Ashley using fear or duress, because they were "particularly vulnerable." In particular, she noted that they were "unique in that they were growing up without any parents," and that their grandmother was "an 82-year-old woman who they couldn't talk to about things like this." In this context, Haldeman "engrained himself into their lives" by taking them to the beach and letting them use the hot tub, such that "[a]ll of the fun things they were getting to do were only because of him." Because Robert and Ashley "had a great relationship" with Haldeman, "loved him," did not "want [their] relationship to end," and "didn't have anyone else to do these kinds of things with," she argued that Haldeman committed the offenses using fear or duress. Substantial evidence supports these arguments.

With respect to Robert, he testified that he was "very vulnerable" when he moved in with his grandmother, in part because his "dad wasn't around" and he had "very little" contact with his parents, and that his friendship with Haldeman was "key." He did not tell anyone about the incidents because he was "ashamed," "scared," and "felt as if really nobody would believe me." The only person he "had to confide in was [his] grandmother," who was "strict" and "old-school," and he feared that if he told her "she would probably kick

32

me out" and he would be "homeless." From this testimony, the jury could infer that Haldeman used duress or fear in committing the offenses.

With respect to Ashley, she testified that she did not tell anyone about the incidents because she "was scared" of her "family being hurt"—"[j]ust physically, emotionally, mentally. I . . . didn't want my family hurt." She also felt like she "had to do it because an adult was telling [her] to do it." Substantial evidence thus supports the conclusion that Haldeman accomplished the acts at issue by fear.

In arguing to the contrary, Haldeman argues that there was no evidence of "implied threat or any other use of threats or force," relying on *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*) and *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*). Such reliance is unavailing. In *Espinoza*, the defendant molested his then 12-year-old daughter on several occasions, and at trial she testified she was "too scared to do anything" while her father was molesting her and was afraid to report the molestation because she thought he " 'would come and do something.' " (*Id.* at pp. 1292–1294.) The *Espinoza* court concluded there was insufficient evidence of duress because the victim never testified the defendant used "any 'direct or implied threat' of any kind." (*Id.* at p. 1321.) In support of this conclusion, *Espinoza* relied on *Hecker*, *supra*, 219 Cal.App.3d 1238, which found insufficient evidence of duress where the defendant did not threaten the victim or, with one exception, use physical force, and although the victim "felt 'pressured psychologically' and 'subconsciously afraid,' there was no evidence [defendant] was aware of and sought to take advantage of such fear." (*Id.* at p. 1250; see *id.* at pp. 1250–1251 [" 'Psychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.' "].)

The reasoning of *Espinoza* and *Hecker* has been questioned and undermined by subsequent decisions. After *Espinoza* was decided, the same court that decided *Hecker* called its earlier decision into doubt, explaining, "We believe th[e] language in *Hecker* is overly broad. The very nature of duress is psychological coercion." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15; see *id.* at p. 13 ["The fact that the victim testifies the defendant did not use force or threats does not require a finding of no duress; the victim's testimony must be considered in light of her age and her relationship to the defendant."].) In addition, years after *Hecker* and *Espinoza*, our Supreme Court approved a description of duress in the section 288, subdivision (b) context in a way that parallels *Cochran*, as "us[ing] some form of psychological coercion to get someone else to do something." (*People v. Soto* (2011) 51 Cal.4th 229, 243 (*Soto*).)[11] We agree. (See *Cochran, supra,* 103 Cal.App.4th at p. 15; *People v. Senior* (1992) 3 Cal.App.4th 765, 776 [expressly disagreeing with the holding in *Hecker* regarding the lack of a "threat" and noting that "[t]his contention improperly assumes a molestation cannot be accomplished by duress unless the molester knows why the victim is submitting"]; *People v. Veale* (2008) 160 Cal.App.4th 40, 48–50 [relying on *Cochran* to find sufficient evidence of duress where six or seven year old victim was molested by her step-father "based on [the victim]'s age and size; her relationship to defendant; and her testimony that she feared defendant and feared he would harm or kill her or mother if she told anyone defendant was molesting her"].) Given that Robert and Ashely were 10 and 8 years old, respectively, were growing up without their parents, and highly valued their

---

[11]     *Soto* held that consent is not a defense to a charge of violating section 288, subdivision (b), and disapproved a statement in *Cochran* to the extent it suggested the contrary. (See *Soto, supra,* 51 Cal.4th at p. 248, fn. 12; *Cochran, supra,* 103 Cal.App.4th at pp. 15–16 & fn. 6.)

relationship with Haldeman, the totality of the circumstances here support the jury's finding that Haldeman committed counts 9–13 by means of fear or duress.

**5. Substantial Evidence Supports the Jury's Finding of a Touching on Count 16**

Under section 288, "a 'touching' of the victim is required, and . . . sexual gratification must be presently intended at the time such 'touching' occurs. [Citations.] However, the form, manner, or nature of the offending act is not otherwise restricted. . . . Stated differently, a lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body." (*People v. Martinez* (1995) 11 Cal.4th 434, 444.) And so the jury was instructed pursuant to CALCRIM No. 1111 that count 16 required, in relevant part, that Haldeman "willfully touched any part of a child's body either on the bare skin or through the clothing OR the defendant willfully caused a child to touch his or her own body, the defendant's body, or the body of someone else, either on the bare skin or through the clothing."

Haldeman briefly argues that substantial evidence does not support his conviction on count 16 because "no witness testified that any touching even occurred," noting that Garrett testified that Haldeman did not touch him and that his mother testified that Garrett told her on the night of the incident that Haldeman did not touch him.

But there was substantial evidence that Haldeman touched Garrett while the two were alone together in the bathroom. Garrett and Haldeman went into the bathroom together in their swimsuits, took a shower, and emerged after what Garrett's father testified was "an inordinately long amount of time for two people to rinse off from the hot tub," at which point Garrett was fully dressed with his hair combed. Garrett testified that at the time of the incident, he had "pretty significant speech and motor and

35

coordination issues," such that it would have been "doable but difficult" for him to dress himself after taking a shower. When shown a picture of the shower in question, Garrett testified that "[i]t would have been difficult" for him to get into the shower by himself, and he "[m]ost likely" would have needed assistance to do so. Garett's mother testified that Garrett had "some early developmental delays," and was "a little clumsy," so she "usually helped him" dress himself. And when asked whether it was unusual for Garrett to comb his own hair without help, Garrett's mother replied, "Oh, he did not comb his own hair. Trust me." From all this, the jury could reasonably infer that Haldeman must have touched Garrett at some point while they were in the bathroom together, either in the course of getting dressed or undressed, into or out of the shower, or combing his hair. Haldeman's argument to the contrary simply points to other evidence in the record suggesting that he did not touch Garrett, namely Garrett's contemporaneous statement to his mother and his trial testimony. But it was for the jury to consider and weigh this evidence together with the other evidence just discussed, and Haldeman's argument is defeated by the rule that when we address the sufficiency of the evidence, "[i]t is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown, supra,* 150 Cal.App.3d at p. 970; *People v. Covarrubias, supra,* 1 Cal.5th at p. 890; *People v. Mora and Rangel, supra,* 5 Cal.5th at p. 490.)

## 6. Trial Counsel Was Not Ineffective In Failing to Object to Certain Hearsay With Respect to Count 16

As noted, Garrett's mother testified in relevant part as follows regarding her conversation with Garrett on the night of the incident:

"So I just calmly asked him, I said, 'Garrett, when you were in the shower with Randy, did you have your swimsuits on or were you nakey?' And he said, 'We were nakey.'

"And my heart dropped. And then I asked him, you know, calmly, you know, 'Well, did you play any games in the shower?' And he said, 'Yes. We squirted each other with soap.' And I said, 'Okay.' And he said, 'Yeah. We squirted each other's private parts with soap.' And I said, 'Did you touch Randy? Did Randy touch you?' And he said, 'No.' "

Garrett's father testified similarly that he "specifically remember[ed] asking if [Garrett] got touched in his private areas, and the answer was 'No.' "

Haldeman argues that Garrett's parents' testimony about what Garrett said on the night of the incident was inadmissible hearsay, and trial counsel was ineffective in failing to raise an objection. Haldeman's brief simply asserts that "[b]ecause the evidence was inadmissible and because the evidence served only to bolster the allegation pertaining to Garrett, trial counsel's failure to object to the inadmissible hearsay was deficient and not justified by any reasonable strategy." But, for the same reasons discussed more fully in connection with Haldeman's third argument regarding count 4, this is not the case. Because a touching is a required element of a violation of section 288, subdivision (a), Garrett's statement that he and Haldeman did not touch each other cast doubt on one of the critical elements of the offense, and trial counsel may therefore have chosen not to object because the

37

testimony was helpful to the defense. Haldeman has failed to demonstrate that trial counsel's decision not to object was deficient performance.

### 7, 8 & 9. The Trial Court Did Not Err In Instructing the Jury It Could Consider Haldeman's Other Offenses as Propensity Evidence With Respect to Count 18

Haldeman argues that the trial court erred in instructing the jury that it could consider the charged sex offenses as evidence that he was inclined or disposed to commit sexual offenses and thus committed the offense charged in count 18, unlawful communication and contact with a minor with the intent to commit a sexual offense (§ 288.3, subd. (a)). On this same basis—that the jury should not have been permitted to consider the charged offenses as propensity evidence with respect to count 18—Haldeman also argues that substantial evidence does not support the jury's verdict as to count 18, and that trial counsel was ineffective in failing to object to the trial court's instruction regarding propensity evidence.

In particular, the jury was instructed, without defense objection and pursuant to CALCRIM No. 1191B, as follows:

"The People presented evidence that the defendant committed the crimes of Penal Code Sections 288(a)(i), 286(a)(i), 288(a), 288(b)(1), and 288.3 as charged in Counts 1–19.

"If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offense charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other

38

evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

"[E]vidence of a person's character or a trait of his or her character," including "evidence of specific instances of his . . . conduct," "is inadmissible when offered to prove his . . . conduct on a specified occasion." (Evid. Code, § 1101.) But Evidence Code section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1108, subd. (a).) And subdivision (d)(1) of Evidence Code section 1108 defines a "sexual offense," in relevant part, as "a crime under the law of a state or of the United States that involved any of the following:

"(A) Any conduct proscribed by subdivision (b) or (c) of Section 236.1, Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former Section 288a of, the Penal Code."[12]

_____

[12]   Evidence Code section 1108, subdivision (d)(1) defines "sexual offense" in full as follows:

"(A) Any conduct proscribed by subdivision (b) or (c) of Section 236.1, Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former Section 288a of, the Penal Code."

"(B) Any conduct proscribed by Section 220 of the Penal Code, except assault with intent to commit mayhem.

"(C) Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person.

39

The parties dispute whether the unlawful communication and contact with a minor with the intent to commit a sexual offense (§ 288.3, subd. (a))[13] qualifies as a "sexual offense" such that propensity evidence of Haldeman's other sexual offenses was not made inadmissible by Evidence Code section 1101.  Haldeman argues that because section 288.3 is not listed in Evidence Code section 1108, subdivision (d)(1)(A), that section does not apply, while the Attorney General argues that subdivision reaches "conduct," not specific offenses, and because the target offense under section 288.3 in this case was a lewd act on a child under section 288, count 18 as a whole charged a " 'crime . . . that involved . . . conduct proscribed by . . . Section . . . 288.' "  On reply, Haldeman does not really respond to this argument, except to argue that his "conduct amounted to, at most, an attempt to contact Jack, as the offensive conduct was Haldeman's communication with Jack's mother," and that this conduct is "too attenuated from actual sexual misconduct to fall within the purview of Evidence Code section 1108, subdivision (d)(1)."

We agree with the Attorney General.  " 'If the statutory language is unambiguous, then its plain meaning controls,' " and Evidence Code section

"(D)  Contact, without consent, between the genitals or anus of the defendant and any part of another person's body.

"(E)  Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person.

"(F)  An attempt or conspiracy to engage in conduct described in this paragraph."

[13]     "Every person who contacts or communicates with a minor, or attempts to communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 287, 288, 288.2, 289, 311.1, 311.2, 311.4 or 311.11, or former Section 288a, involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense."

40

1108 defines sexual offenses by the *conduct* committed, not any *conviction* suffered for such conduct. (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1106.) And in *People v. Story* (2009) 45 Cal.4th 1282 (*Story*), our Supreme Court held that Evidence Code section 1108 applied to a defendant tried and convicted on a theory of first degree felony murder with rape and burglary (based on entry with intent to commit rape): "Because a murder during the course of a rape involves conduct, or at least an attempt to engage in conduct proscribed by Penal Code section 261 [defining rape], we conclude that a defendant accused of such a murder is accused of a sexual offense within the meaning of [Evidence Code section] 1108." (*Story*, *supra*, 45 Cal.4th at p. 1285; see *id.* at pp. 1291–1294.) *Story* found support for its holding in *People v. Pierce* (2002) 104 Cal.App.4th 893 (*Pierce*), where the Court of Appeal concluded that the crime of assault with intent to commit rape (§ 220) was a sexual offense within the meaning of Evidence Code section 1108, even prior to the amendment that added that crime to the list of included sexual offenses (Evid. Code, § 1108, subd. (d)(1)(B)), because it "involves" conduct proscribed by the offenses listed in section 1108, subdivision (d)(1)(A).[14] (*Pierce*, *supra*, at p. 898; *Story*, *supra*, 45 Cal.4th at pp. 1293–1294.)

---

[14] The court in *Story* also discussed *People v. Walker* (2006) 139 Cal.App.4th 782 (*Walker*), where the Court of Appeal interpreted section 1108 as requiring "that the requisite sexual transgression must be an element or component of the crime itself without regard to the evidence establishing a specific violation." (*Walker*, *supra*, at p. 800; *Story*, *supra*, 45 Cal.4th at pp. 1291–1292.) *Story* declined to decide whether *Walker*'s interpretation was correct, instead finding that even under its reasoning, "first degree felony murder with rape the underlying felony involves, as an element, conduct proscribed by Penal Code section 261, the statute defining rape, or at least an attempt to engage in that conduct." (*Story*, *supra*, 45 Cal.4th at p. 1292.)

41

Under *Story* and *Pierce*, Haldeman's argument that Evidence Code section 1108 does not apply to count 18 simply because section 288.3 is not a listed offense under Evidence Code section 1108, subdivision (d)(1)(A) must be rejected.[15] And under those authorities, taken together with the target offense of a lewd act on a child (§ 288), count 18 as charged "involves conduct, or at least an attempt to engage in conduct, proscribed" by section 288. (*Story, supra*, 45 Cal.4th at p. 1285; *Pierce, supra*, 104 Cal.App.4th at p. 898.) Accordingly, the trial court did not err by instructing the jury that it could consider Haldeman's other offenses as propensity evidence under Evidence Code section 1108 with respect to count 18.[16]

Given this conclusion, we also reject Haldeman's argument that substantial evidence does not support the jury's guilty verdict on count 18—which is based entirely on his contention that the jury could not consider his other offenses as propensity evidence under Evidence Code section 1108—as well as his argument that trial counsel was ineffective in failing to object

---

[15] As the Attorney General observes, the Legislature may have chosen not to enumerate section 288.3 in Evidence Code section 1108, subdivision (d)(1)(A) because doing so would have extended section 1108 to all the available target offenses under section 288.3, including non-sexual crimes such as kidnapping (§ 207) and kidnapping for ransom (§ 209). (See § 288.3, subd. (a).)

[16] In any event, we think it clear that the alleged error in this instruction was harmless under any standard. It was undisputed that Haldeman sent Jack's mother the emails in question, and the emails themselves were admitted into evidence. The only question for the jury was thus whether, in sending the emails, Haldeman had the "intent to commit" a lewd act on a child in violation of section 288. And Evidence Code section 1101 does not "prohibit[] the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent, . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

when the prosecutor told the jury during closing argument that they could rely on Haldeman's other offenses in considering whether he was guilty on count 18. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 [failure to raise a meritless objection does not constitute ineffective assistance of counsel].)

### 10. Trial Counsel Was Not Ineffective In Failing to Object to Haldeman's Statements to His Sister on the Ground of Attorney Client Privilege

In monitoring Haldeman's phone conversations while in jail awaiting trial, San Mateo County Detective Joseph Fava became aware that Haldeman's sister, Kathleen Palella, was planning to visit him at the jail on October 18, 2019, and that Haldeman expected to have a "nonrecorded" visit with her.[17] Detective Fava placed a recording device in the visitation room and recorded Haldeman's October 18 visit with his sister, and a portion of that recording was played for the jury without defense objection.[18]

Following his convictions and represented by new counsel, Haldeman moved for a new trial, including on the ground that his trial counsel was ineffective in failing to seek to exclude the evidence of statement he made

---

[17]     Detective Fava testified that that there was no legal prohibition on recording the conversation, and that "[i]n fact, there's actually signs outside the visitor room letting them know that all conversations are subject to recording, with the exception of attorney visits."

[18]     Haldeman's brief argues that "[t]here were two portions of the conversation that were particularly harmful to the defense case." The first was Haldeman's discussion of explaining to Peter that, in taking care of him while he was on LSD, " 'I was helpin' you out here, nothing bad happened, particularly the most egregious claims,' " such that Peter "can ask for leniency, in effect, to the judge." The second was Haldeman's statement that certain of the charges were "silly" "misunderstanding[s]" that were "fixable," and "if we can get it down to—to simpler charges, it's a lot more manageable at that point."

during his visit with his sister as protected by the attorney-client privilege. Attached to the motion was an affidavit from Haldeman's sister, indicating that "[o]n October 14, 2019, [she] went to [trial counsel's] office in Redwood City to meet him and to give him some photos that might be helpful for [Haldeman]'s defense," that she and trial counsel "agreed that [he] would enlist [her] services to help with [Haldeman]'s defense," in particular, that she would "transcribe [Haldeman]'s handwritten notes to save on outside help; . . . assist with photocopying letters and photos from [Haldeman]'s files at home; and . . . conduct specific research." Palella "subsequently spent the better part of two full work days at [trial counsel]'s office copying photos, organizing papers and other documents." Also attached to the affidavit was an email dated October 14, 2019, from trial counsel to members of his office stating that Palella "will be part of our defense team," an email from Palella to trial counsel documenting work she had done on October 17, and an October 18 email from trial counsel to Palella asking her to research cases involving lewd and lascivious conduct and duress.

The prosecution filed opposition, and Haldeman's counsel a reply, and the motion came on for an evidentiary hearing on August 26 and September 9, 2022. At the conclusion of the hearing, the trial court found it was "unclear" whether Palella was "really in effect part of the legal team" and that it did not appear that trial counsel had engaged her to meet with Haldeman at the jail. The trial court noted that Palella said things that reflected her belief that their conversation could be recorded, and opined that the use of a public room monitored by the authorities "waive[d] any privilege that might have applied." The trial court also found that the conversation was "not necessarily privileged" as Palella "never informed trial counsel about what [Haldeman] told her in that recorded conversation," never stated

44

that she had been engaged "to act as a go-between," and never established that Haldeman's disclosure to her was necessary, which were preliminary facts required to establish the privilege under Evidence Code section 952. Finally, the trial court concluded that Haldeman had not established prejudice, because the damage from any of the statements had to be "juxtapose[d] . . . with the testimony of . . . [n]ine complaining witnesses who all testified at trial that they were molested and abused by [Haldeman] over a period of time, each one independent of each other."

Where, as here, the trial court has denied a motion for a new trial based on an ineffective assistance claim, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts demonstrate a violation of the right to effective counsel. (*People v. Cervantes* (2017) 9 Cal.App.5th 569, 590–591, disapproved on another ground in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 314–315; accord, *People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

Haldeman's opening brief does not even discuss the standard of our review, let alone make any effort to show how applying it requires reversal here. He simply asserts that "the evidence established that Palella joined trial counsel Smith's legal team on October 14, 2019," based on Palella's declaration and Smith's email to staff announcing that Palella was "part of our defense team." But the trial court made several factual findings that defeat Haldeman's argument, findings that Haldeman does not even attempt to challenge on appeal. In particular, the trial court found that Palella's interruption of Haldeman when he said "events" to say "the alleged

45

incidents,"[19] together with the signs indicating that all conversations were subject to recording, indicated that she was aware the conversation may have been recorded and thus waived the privilege. (See *D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 735 ["the privilege may be waived by failure to maintain confidentiality . . . [t]hus, where the client communicates with his attorney in the presence of other persons who have no interest in the matter . . . he is held to have waived the privilege"].) And the trial court found that Palella did not document her time for her visit with Haldeman, that it did not "appear that Mr. Smith engaged her to meet with Mr. Haldeman at the jail," and that she "never informed trial counsel about what the defendant told her in that recorded conversation or that she was engaged by him to act as a go-between," findings that undermine his claim that his sister was a member of his legal team and findings we must defer to if supported by substantial evidence. Finally, the trial court found that Haldeman had failed to establish that his disclosures to his sister were necessary under Evidence Code section 352,[20] and that failure defeated his claim of privilege.

---

[19] In discussing the sale of his house, Haldeman had the following exchange with his sister:

"Q: . . . Um, the—for the sale of the house, there could be—because I live there, there could be damage to the price, right? So what (Eileen) can say, with—simply by word of mouth is that the few couple of events that happened—happened in the hot tub, the green hot tub outside, and that is now in the dump yard. And that's it. All right?

"A: (Unintelligible) the alleged incidents . . .

"Q: The alleged incidents happened in the old hot tub. . . ."

[20] (See Evid. Code, § 952 [disclosure of privileged information to third party must be to "those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the

On reply, Haldeman argues that even if not "reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer [was] consulted," his disclosures were nevertheless "to further the interest of the client." (See Evid. Code, § 952.) But he does not offer any argument why the various disclosures made to his sister were in his interest—and we can discern none, especially given the trial court's factual findings that Palella was not engaged to meet with him at the jail, that she never relayed the disclosures to the rest of his legal team, and that they were not "necessary" either to transmit the information or for the purpose for which his trial counsel was consulted. In short, given the trial court's factual findings, which Haldeman does not challenge, his claim of ineffective assistance of counsel must fail.

### 11. Trial Counsel Was Not Ineffective In Failing to Object to Prosecutor's Statement During Closing Argument that Haldeman Admitted Touching Victims

In discussing counts 9–15 during rebuttal closing argument, the prosecutor stated:

"Let me talk one more time very quickly about the lewd and lascivious touching under duress. This is the count where the defendant is addressing his sister, and he says: It's not like anybody had a gun to their head. Yeah, I touched them, but I didn't force them. Why is the DA charging force or fear? Nobody had a gun to their head."

Haldeman argues that in telling the jury that Haldeman told his sister, "Yeah, I touched them," the prosecutor made a "false assertion that Haldeman

---

transmission of the information or the accomplishment of the purpose for which the lawyer is consulted"].)

47

made some sort of confession," and that his trial counsel was ineffective in failing to object.[21]

We conclude the argument was not misconduct. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) Haldeman's statement to his sister suggested that one part of his strategy was to "explain . . . to [his] accuser[s]" the "differences between misdemeanors and felonies," such that they would then explain to the prosecution that "there wasn't a gun to my head" or any "threats," and thereby have the severity of the charges reduced. One inference to be drawn from this statement was that Haldeman was admitting he was not falsely accused or entirely innocent, but seeking to have the charges reduced at the request of his accusers because the prosecution had overcharged the case. We think "the prosecutor was engaged in asking the jury to draw permissible inferences from the evidence," and "[w]hether the inferences drawn by the prosecutor were reasonable was a question for the jury to decide." (*Id.* at pp. 473, 474.) The prosecutor's argument did not render the trial "fundamentally unfair," nor did it involve " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Bennett* (2009) 45 Cal.4th 577, 595.)

---

[21] According to the transcript, Haldeman's actual statement to his sister was as follows:

"Part two is he probably talked about the differences between misdemeanors and felonies. The—in both our opinions, they should all be misdemeanors. The county is known for just throwing felonies out just like candy. So the—the idea is to explain that to the accuser, which they don't have that explained to them. Once they know the difference, it's like 'Oh, there wasn't a gun to my head. There wasn't threats,' and so on. So we dial that—that's part two."

Nor has Haldeman demonstrated that had his trial counsel objected and obtained an admonition, there was a reasonably probability of a different result. The recording of Haldeman's conversation with his sister was in evidence for the jury to review for themselves, and after closing arguments, they were instructed pursuant to CALCRIM No. 200 that "It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial," and pursuant to CALCRIM No. 222 that "Nothing that the attorneys say is evidence. In their opening and closing statements, the attorneys discuss the case, but their remarks are not evidence." "We of course presume 'that jurors understand and follow the court's instructions.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Thus, even assuming the prosecutor's comments were improper, Haldeman has failed to demonstrate that trial counsel's failure to object was prejudicial.

## 12. Trial Counsel Was Not Ineffective In Failing to Call Character Witnesses

Haldeman argues that his trial counsel was ineffective in failing to call character witnesses on his behalf. In support, he points to the statements of several persons who submitted statements for the trial court to consider at sentencing, including Curt McGee and his wife Ulla McGee, who were Haldeman's neighbors for 20 years, Jeff and Lisa Marcacci, who knew Haldeman through church, Fr. Seán ÓLaoire, a priest who has known Haldeman since 1988, and Haldeman's mother and brother. Haldeman argues that because "nearly the entire defense case hinged on the jury's assessment of [his] credibility . . . it was absolutely necessary that the defense present other witnesses who could vouch for [his] good character in order to prevent the jury from dismissing his testimony."

As noted, on direct appeal, "a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no

49

rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)  And the decision whether to call certain witnesses is a "matter[] of trial tactics and strategy which a reviewing court generally may not second-guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059; *People v. Bolin* (1998) 18 Cal.4th 297, 334 ["Whether to call certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate"]; *People v. Williams* (1970) 2 Cal.3d 894, 905 ["Whether to call certain witnesses is generally a matter of trial tactics"].)

Under these circumstances, there could be myriad satisfactory explanations why trial counsel did not call character witnesses as part of the defense case.  Haldeman has made no showing that the various persons who submitted statements supporting him for sentencing purposes were able or willing to testify at trial, and he does not make any offer of proof as to how those potential witnesses may have testified.  Nor does he allege that his trial counsel failed to adequately investigate potential character witnesses.  Trial counsel may have decided not to introduce evidence of Haldeman's good character because doing so would have opened the door to allow the prosecution to present its own rebuttal evidence regarding Haldeman's character.  (Evid. Code, § 1102, subd. (b); *People v. Pangelina* (1984) 153 Cal.App.3d 1, 8 ["[G]ood reasons exist for not introducing character evidence . . . [and] most experienced criminal lawyers do not present character evidence unless their client's reputation is unassailable"].)  Or, as the trial court noted in rejecting this same argument in Haldeman's motion for a new trial, a series of hypothetical character witnesses testifying that Haldeman was a "great guy" and was "wonderful to my kids, but I don't know

anything that he did with others" may have simply "reinforce[d] the theory of the prosecution . . . [that] these things took place in secret outside the public view," and thus whether to call such witnesses was a "strategic call."  In short, on this record, we cannot conclude that "there simply could be no satisfactory explanation" for trial counsel's failure to call character witnesses in Haldeman's defense.  (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

**13.  The Prosecutor Did Not Impermissibly Dilute the Reasonable Doubt Standard of Proof and Trial Counsel Was Not Ineffective in Failing to Object to the Same**

While explaining to the jury as part of her closing argument that the prosecution need only prove certain of special allegations by a preponderance of the evidence, the prosecutor stated as follows:

"Most of these crimes have a special allegation attached to them.  So what you are asked to do is find:  Is he guilty or not guilty of the crime?  If he's guilty of the crime, is the special allegation true or not true?

"And there are different burdens of proof.  So this is where it gets complicated.  I have to prove the elements of this case to you beyond a reasonable doubt.  That means you have an abiding conviction, based on the evidence.  You think the charge is true, based on the evidence.  That's all that means.

"Don't get caught up with beyond a reasonable doubt and think that's some impossible standard that can't be met.  It's met in courtrooms across this country every single day in criminal trials.  *All it means is you believe the charge is true, and your belief is based on the evidence.*

"But for the special allegation that I'm going to talk about now, I don't have to prove it to you beyond a reasonable doubt.  There are some elements of it that I have to prove to you by a preponderance of the evidence.  And all that means is, it's more likely than not that this is true."  (Italics added.)

Haldeman argues that in characterizing the reasonable doubt standard as meaning that "you believe the charge is true, and your belief is based on the evidence," the prosecutor impermissibly diluted the prosecution's burden of proof, and that his trial counsel provided ineffective assistance in failing to object on this basis.

"[A] prosecutor's 'misbehavior "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] 'Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' [Citation.] When, as here, misconduct is asserted 'based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' [Citation.]" (*People v. Nadey* (2024) 16 Cal.5th 102, 184 (*Nadey*).)

Generally, prosecutorial misconduct claims are forfeited unless the defendant makes a timely and specific objection at trial and requests that the jury be admonished to disregard the improper statements. (*Nadey, supra*, 16 Cal.5th at p. 185.) "Failure to raise a timely objection and request an admonition will be excused only ' "if doing either would have been futile, or if an admonition would not have cured the harm." ' [Citation.] However, ' "[a] defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." ' [Citation.]" (*Ibid*.)

To begin with, Haldeman's argument is forfeited. "A prosecutor's misstatements of law are generally curable by an admonition from the court."

(*People v. Centeno* (2014) 60 Cal.4th 659, 674; see *People v. Otero* (2012) 210 Cal.App.4th 865, 873 [finding misconduct in using diagram to describe reasonable doubt harmless where trial court "ordered the diagram taken down as soon as defense counsel objected and admonished the jury to disregard it" and there was "no reason to believe the jury did not abide by the admonishment"]; *People v. Thomas* (2021) 64 Cal.App.5th 924, 952–955 [claim that prosecutor diluted reasonable doubt standard forfeited by failure to object]; *People v. Ennis* (2010) 190 Cal.App.4th 721, 736–737 [same].) Nothing in this record indicates that an objection would have been futile. Nor was the prosecutor's argument "so extreme or pervasive" that a prompt objection and admonition would not have cured the harm. (*People v. Centeno*, *supra*, 60 Cal.4th at p. 674.) Nevertheless, "[a] defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) Accordingly, we consider whether Haldeman has carried his burden of showing prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) And conclude that he has not.

Significantly, the challenged comments by the prosecutor came close to the beginning of her closing argument. Later on in her closing argument, the prosecutor returned to the issue of reasonable doubt, telling the jury that "I have to prove this case to you beyond a reasonable doubt . . . [¶] You may still have some questions. You may still wonder certain things. But the thing to remember is: Does that question cause you to have a reasonable doubt that this charge is true as to each of the charges, or is it just something

that would be nice to know, but I still think based on the evidence that these charges are true?  [¶]  And I'll submit to you that this case has been proven to you beyond a reasonable doubt."

And trial counsel had a full opportunity to address the challenged comments in his own closing argument, and took it, telling the jury that "[t]he concept that the DA tells you, 'don't get caught up with,' is the cornerstone of our system of justice.  It is the principle that guides your decision in this case."  Trial counsel then displayed CALCRIM No. 220, defining the burden of proof, and gave a lengthy explanation of reasonable doubt.[22]  (Cf. *People v. Centeno*, *supra*, 60 Cal.4th at pp. 676–677 [finding

---

[22]     " 'Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.'  What does that mean?  What is an 'abiding conviction'?  'Abiding' means long-lasting; that not only— by this pace, it will probably be tomorrow or later when you render your verdict, you can say to yourself in your heart, your mind, your soul, your essence, 'I know I made the right decision,' but next week or next month or next year when you look back upon your verdict, you can be comfortable in saying, 'I know I made the right decision.'  That's what the word 'abiding' means.

"What does the word 'conviction' mean when it's used in this sense?  It means belief.  But it means the strongest belief that we humans can have when dealing with matters of human affairs and human conduct, very little of which is ever susceptible to scientific, mathematical, or absolute proof.  But it's the strongest belief that we can have.  That's what 'abiding conviction' means.

"A juror once said to me, 'Mr. Smith, what the concept means to me is that I must give consideration to my role as a juror, the same consideration that I give to the most important decisions I make in my life:  What kind of career path should I choose?  Should I buy a house and saddle myself with a mortgage for the next 30 years?  Whom should I marry?  I must be as certain of my decision in this case, Mr. Smith, as I am in those most important decisions I make in my life.'

"And then he reflected for a moment, and he said, 'And as I think about it, before I convict someone of a crime, I need to be more certain than I am in those most important decisions because, you know, if I choose the wrong

54

prosecutor's dilution of the burden of proof prejudicial because it "came in rebuttal" and thus was "the last word on the subject," leaving "defense counsel . . . no opportunity to counter it with argument of his own"].)

Furthermore, after the closing arguments of counsel, the trial court correctly instructed the jury using CALCRIM No. 220 on the presumption of innocence, reasonable doubt, and the prosecution's burden of proof. "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (*Boyde v. California* (1990)

---

career path, I can always change it. If I can't afford the house, can't afford the mortgage, I can always sell it. And God forbid, if I choose the wrong spouse, I can get a divorce. So I must be even more certain because I understand, Mr. Smith, if I say "guilty" and fellow jurors say "guilty," I can't come back the next day and say, "Judge, you know, I'm not really sure I made the right decision." '

"He's right. I can't say it any more eloquently than what he said. That's what this concept that the DA tells you 'don't get caught up with' means. That's the level of certainty you must have.

"Under our concept of reasonable doubt, if the evidence shows possibly, could be; may be, might be; preponderance, the scales are tipped 51/49; very likely; strong suspicion; clear and convincing evidence which is the concept used in civil cases when someone is trying to get punitive damages and the Court says you can't just tip the scale to get punitive damages; you must really show your entitlement by clear and convincing evidence, but that's just money, folks.

"This is much more important. Think about what I'm asking. I'm asking you, in some regards, to say to yourself, if the burden was clear and convincing evidence, I would say 'guilty' and convict him. But I'm not at proof beyond a reasonable doubt. There are things that I heard and I considered and I saw that said to me 'I have a doubt.' "

494 U.S. 370, 384; accord *People v. Mendoza* (2007) 42 Cal.4th 686, 703; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 717.) Given all this, we conclude that Haldeman has failed to demonstrate prejudice from his trial counsel's failure to object to the prosecutor's statement.

**14. The Prosecutor Did Not Commit Misconduct In Referring to Haldeman as a "Monster" During Closing Argument Nor Was Trial Counsel Ineffective in Failing to Object**

The prosecutor began her closing argument to the jury as follows:

"For 30 years there was a monster lurking in the Ladera neighborhood of Menlo Park. He was preying on the children in the neighborhood, at the local pool, even at the church. And some folks whispered and some folks talked, but they all looked the other way because he didn't look like a monster.

"He had a double degree from Duke, a nice house, a wife, kids. He didn't drive a van and snatch kids off the street. He didn't have to. He had a fancy convertible. And he would ask parents for permission to take their kids on rides.

"He insinuated himself in any way possible to be around children: volunteered for the Big Brother's program; offered kids money to come to his house to pick fruit; offered kids rides in his car; showed up to play basketball

56

and do magic tricks; volunteered to make swim videos of kids in their swim clothes at the local rec center.

"And none of his victims said anything because who would believe them? He didn't look like a monster. But today his mask has been taken off. All of the victims that testified for you told you what he is. The evidence here has shown you what he is. He is a true predator."

" ' "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." ' " (*People v. Fayed* (2020) 9 Cal.5th 147, 207.) And as noted, prosecutors have wide latitude in closing argument to comment on the evidence and reasonable inferences based on the evidence. (*People v. Leon* (2015) 61 Cal.4th 569, 606 (*Leon*); *People v. Lucas*, *supra*, 12 Cal.4th at p. 473.) A prosecutor is not " 'required to discuss his [or her] view of the case in clinical or detached detail.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1021, quoting *People v. Panah* (2005) 35 Cal.4th 395, 463.) However, " ' "[i]t is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' " ' " (*Leon, supra,* 61 Cal.4th at pp. 605–606, quoting *People v. Linton* (2013) 56 Cal.4th 1146, 1210.)

Haldeman's trial counsel did not object to, or request an admonition regarding, the prosecutor's use of the terms "monster" and "predator" in the beginning of her closing argument. And Haldeman's opening brief simply asserts, without citation to the record or authority, that "it is clear no admonishment would have been sufficient to cure the harm done by the prosecutor's blatant dehumanization of Haldeman in the eyes of the jury." This "ritual incantation" is not enough. (*Nadey*, *supra*, 16 Cal.5th at p. 184.)

57

There is no basis in the record to conclude that a request for an admonition would have been futile. Haldeman's claim is forfeited.[23] (*Nadey*, *supra*, 16 Cal.5th at p. 185.)

However, because Haldeman argues that his trial counsel was ineffective in failing to object to the terms and request an admonition, we will reach of the merits of his argument—and conclude it has none.

Haldeman was accused of 19 sexual offenses—several of them by use of force, duress, or an anesthetic substance—with 11 different underage victims, over a period spanning almost 30 years. The prosecution presented further evidence of several uncharged incidents as character evidence in support of the charged counts. The prosecutor's statements regarding Haldeman's convertible, the Big Brother program, offering children money to come to his house to pick fruit, performing magic tricks, and volunteering to make videos of the swim team at the local recreation center were all based on the evidence. And at sentencing, Peter's mother, Ashley, and Michael each gave statements in which they characterized Haldeman as a "monster." Based on this record, we find the prosecutor's three descriptions of Haldeman as a "monster" and the single use of "predator" in the introduction to her argument were within the " ' "wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence." ' " (*Leon*, *supra*,

---

[23] Citing *People v. Vera* (1997) 15 Cal.4th 269, Haldeman argues that his argument is not forfeited because a defendant can raise for the first time on appeal a claim asserting the deprivation of "certain fundamental, constitutional rights." (*Id.* at p. 276.) But this "narrow class" of fundamental rights—the right to jury trial and the right not to be placed in jeopardy twice (*ibid.*)—is not implicated here. (See *People v. Tully*, *supra,* 54 Cal.4th at p. 980, fn. 9 ["Moreover, that dictum in *Vera* was not intended to provide defendants with an 'end run' around the forfeiture rule, thus eviscerating it. We therefore reject defendant's reliance on *Vera* here and at every other point at which he invokes it to avoid forfeiture."].)

61 Cal.4th at p. 606; see *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1075 [finding reference to defendants as "predators" and "monsters" permissible where defendants committed multiple brutal crimes against victim].)[24]

## 15. The Trial Court Did Not Err In Instructing the Jury With CALCRIM No. 1193

The trial court instructed the jury pursuant to CALCRIM No. 1193, the written version of which instructions provided as follows:

"You have heard testimony from expert witness Miriam Wolf regarding child sexual abuse accommodation syndrome.

"Ms. Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged.

"You may consider this evidence only in deciding whether or not a victim's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his or her testimony."

---

[24] The cases cited by Haldeman are not to the contrary. In *People v. Sanders* (1995) 11 Cal.4th 475, our Supreme Court held that "even assuming that the reference to the defendant as a 'monster'" constituted misconduct, "no prejudice [was] shown, in light of the record as a whole." (*Id.* at p. 527.) In *Darden v. Wainwright* (1986) 477 U.S. 168, the Supreme Court found that the prosecutor's remarks, which "incorporated the defense's use of the word 'animal,'" "deserve[d] . . . condemnation" but did not render the trial fundamentally unfair. (*Id.* at pp. 179–181.) And in *People v. Fosselman* (1983) 33 Cal.3d 572, our Supreme Court concluded that defendant had forfeited his challenge to a series of inappropriate remarks by the prosecutor, including one in which he characterized the defendant as an "'animal . . . out to get somebody that morning,'" by failure to object and had failed to demonstrate ineffective assistance of counsel. (*Id.* at pp. 580–582.)

Haldeman argues that the trial court erred when it instructed the jury with CALCRIM No. 1193 because the instruction "improperly allowed the jury to use CSAAS evidence to assess the credibility of the accusers."

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

It is a longstanding principle that CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.)

Haldeman acknowledges that multiple California Courts of Appeal have upheld the language of CALCRIM No. 1193 as accurately informing the jury of the limited use of CSAAS evidence. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*); *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176 (*Lapenias*).) Nonetheless, Haldeman contends that those cases were wrongly decided. The sum total of his argument is that "[w]hat *Gonzales* overlooked, however, is that the instruction fails to inform the jury 'that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other.' (*Gonzales, supra*, 16 Cal.App.5th at p. 504.) Instead, by instructing the jury that the CSAAS testimony may be used to assess believability, it implies that the testimony, presented by the prosecution, may be used to bolster believability."

We are not persuaded by Haldeman's argument that the existing precedent is wrong. (See *People v. Ramirez* (2023) 98 Cal.App.5th 175, 219 ["To the extent that CALCRIM No. 1193 allowed the jury to consider [the expert]'s testimony in their evaluation of the believability of the testimony from [the victims], the instruction is proper"]; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816 [similar].) And in any event, assessing the instruction in light of the entire record, we are not convinced that there is a reasonable likelihood the jurors here applied the instruction in the manner Haldeman suggests. The instruction told the jurors that Wolf's testimony could not be considered as evidence that Haldeman "committed any of the crimes charged against him or any other conduct or other crimes with which he was not charged." Wolf testified that she "really [did not] know about the facts of this case," and was "here to testify . . . about CSAAS as a concept." She explained that was not "here today to provide an opinion as to whether any of the victims in this case were actually sexually molested," but rather to "correct[] some of the misunderstandings about the dynamics of how children experience and report child sexual abuse," in order to "help the jury evaluate the information that does come to them by understanding what might be common, even though it might not be what we think." And on cross-examination, Wolf agreed that "CSAAS is not a scientific tool to establish if a charge of child molestation is true." Under these circumstances and on this record, we find no " 'reasonable likelihood the jury applied the instruction' " so as to impermissibly "bolster" the credibility of the victims as Haldeman suggests. (*People v. Rivera, supra*, 7 Cal.5th at p. 326.)[25]

---

[25] The cases cited by Haldeman are not to the contrary. In *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*), [we held] that "in all cases in which an expert is called to testify regarding CSAAS . . . the jury must sua sponte be instructed that (1) such evidence is admissible solely for the

61

### 16. There Was No Cumulative Error

Having concluded that Haldeman's claims challenging his convictions are without merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

### 17. The Trial Court's Finding that Counts 4–13 and 16 Involved Separate Victims or Were Committed on Separate Occasions Did Not Violate the Sixth Amendment

Haldeman argues that his Sixth Amendment right to trial by jury was violated because the trial court, and not the jury, found that counts 4–13 and 16 involved separate victims or the same victim on separate occasions and therefore required consecutive sentencing under *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*), where the Supreme Court held that factual findings, other than

---

purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id*. at p. 959.) We went on to conclude that any error in failing to give such an instruction was harmless, because the expert in that case had "twice told the jury she had not met the victim and had no knowledge of the case," and "[h]er testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim." (*Ibid*.) The jury here was given such an instruction, and Wolf testified similarly. *People v. Perez* (2010) 182 Cal.App.4th 231 rejected the defendant's challenge to the admissibility of CSAAS evidence (*id*. at p. 245), and in *People v. Sandoval* (2008) 164 Cal.App.4th 994, the Court of Appeal rejected the defendant's argument that the trial court abused its discretion in excluding the testimony of a defense expert regarding "couples, conflict and sex, and the theory colloquially referred to as 'make-up sex,' " finding that it was not akin to CSAAS testimony. (*Id*. at pp. 1000–1003.)

the fact of a prior conviction, that increase the defendant's sentencing exposure must submitted to the jury and proven beyond a reasonable doubt.

As Haldeman's opening brief acknowledges, our own Supreme Court rejected his argument in *People v. Catarino* (2023) 14 Cal.5th 748 (*Catarino*). There, the defendant was convicted of six counts of forcible lewd acts on a child (§ 288, subd. (b)(1)) and one lesser included count of attempt to commit the same offense. (*Catarino*, *supra*, 14 Cal.5th at pp. 750, 753.) After finding that Catarino's seven counts of conviction "corresponded to 'seven separate incidents pursuant to . . . section 667.6[, subdivision] (d)," the trial court sentenced him to consecutive terms for each of the seven offenses. (*Catarino*, *supra*, 14 Cal.5th at p. 750.) Our Supreme Court rejected Catarino's argument that sentencing him under section 667.6, subdivision (d) without having submitted to the jury the question of whether each of his offenses was committed on a separate occasion denied him his Sixth Amendment right to a jury trial under *Apprendi* and *Alleyne*. (*Catarino*, *supra*, 14 Cal.5th at p. 757.) *Catarino* observed that section 667.6, subdivision (d) "does not change what is a 'full' term or otherwise define the sentence for any particular offense," but rather "requires that the term *already authorized* (§ 288, subd. (b)(1)) be meted out as a full term," and thus "does not define or alter the term for any particular offense in a manner that invades the historical province of the jury." (*Catarino*, *supra*, 14 Cal.5th at p. 756.)

In reaching this conclusion, *Catarino* relied on *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*), where the Supreme Court held that the *Apprendi* rule does not apply to facts deemed necessary to the imposition of consecutive as opposed to concurrent sentences, "a sentencing function in which the jury traditionally played no part," in part because the "core concerns" underlying *Apprendi*—"encroachment . . . by the judge upon facts historically found by

63

the jury" and the "threat to the jury's domain as a bulwark at trial between the State and the accused"—are not implicated by "legislative reforms regarding the imposition of multiple sentences." (*Ice, supra*, 555 U.S. at pp. 163, 168, 169; see *Catarino, supra*, 14 Cal.5th at p. 755 ["States may, consistent with the Sixth Amendment, enact legislation to 'constrain judges' discretion by requiring them to find certain facts before imposing consecutive, rather than concurrent, sentences' "].)

However, shortly after Haldeman's opening brief was filed, the Supreme Court decided *Erlinger v. United States* (2024) 602 U.S. 821 (*Erlinger*). There, the defendant pleaded guilty to being a felon in possession of a firearm (18 U.S.C. § 924, subd. (a)(2)), a charge that ordinarily carried a sentence of up to ten years in prison. (*Erlinger, supra*, 602 U.S. at p. 825; 18 U.S.C. § 924, subd. (a)(2).) But the prosecution also charged the defendant under the Armed Career Criminal Act (ACCA) (18 U.S.C. § 924(e)(1)), which increases the potential prison term to a minimum of 15 years if the defendant has three prior convictions for "violent felon[ies]" or "serious drug offense[s]" that were "committed on occasions different from one another." (18 U.S.C. § 922, subd. (g); *Erlinger, supra*, at p. 826.) After the trial court found that Erlinger had such convictions, it sentenced him to the minimum 15 years in prison. (*Erlinger, supra*, 602 U.S. at p. 827.) The Supreme Court held that the trial court's resolving the ACCA's "occasions inquiry" violated the Sixth Amendment under *Apprendi* and *Alleyne*, because it had the effect of increasing both Erlinger's potential minimum *and* maximum sentence, and " '[a] fact that increases' a defendant's exposure to punishment, whether by triggering a higher maximum *or* minimum sentence, must 'be submitted to a jury' and found unanimously and beyond a reasonable doubt." (*Erlinger*,

*supra*, 602 U.S. at pp. 835, 833; quoting *United States v. Haymond* (2019) 588 U.S. 634, 643.)

In his respondent's brief, the Attorney General argues that "Nothing in *Erlinger* contravenes *Catarino*, which relates to consecutive sentencing." On reply, Haldeman asserts that "Both *Catarino* and *Erlinger* address the judicial determination of the question of whether crimes were committed on separate occasions where the answer to that question directly impacts a defendant's sentence." But as *Catarino* explained, the trial court's [factual finding under section 667.6, subdivision (d)] did not "does not change what is a 'full' term or otherwise define the sentence for any particular offense," nor did it increase or decrease Haldeman's potential minimum or maximum sentence. (*Catarino*, *supra*, 14 Cal.5th at p. 756.) Instead, it merely "requires that the term *already authorized* [by the jury's verdict] (§ 288, subd. (b)(1)) be meted out as a full term," and that in the case of multiple terms, that they be run consecutively. (*Catarino*, *supra*, 14 Cal.5th at p. 756.) Nothing in *Erlinger* contravenes *Ice*, upon which *Catarino* relied in drawing a contrast between section 667.6, subdivision (d) and the *Apprendi* line of cases. (See *Catarino*, *supra*, 14 Cal.5th at pp. 755–757.) We conclude that *Catarino* remains good law even after *Erlinger*, and defeats Haldeman's Sixth Amendment challenge to his sentence. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### 18. The Jury's Findings Under Former Section 1203.066 Need Not Be Vacated

As noted, with respect to counts 1–3, the jury found true the special allegation that Haldeman occupied a position of special trust and committed an act of substantial sexual conduct pursuant to former section 1203.066, subdivision (a)(9), which barred probation for "[a] person who occupies a position of special trust and commits an act of substantial sexual conduct."

65

(Former § 1203.066, subd. (a)(9); see *People v. Grim* (1992) 9 Cal.App.4th 1240, 1241.)  Haldeman argues that because the statute was amended in 1994—after the offenses described by counts 1–3 were committed—to remove this provision, these findings must be vacated.  (See Stats. 1994, ch. 447, § 3.)

To begin with, Haldeman's argument is plainly forfeited.  The allegations under section 1203.066, subdivision (a)(9) were included in the initial felony complaint filed August 21, 2019—meaning Haldeman had the better part of two years to raise before the trial court the argument he now makes for the first time on appeal.  (See *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [noting the "well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court"].)  It is also without merit.  Haldeman does not argue that he was eligible for probation, even without the jury's true findings with respect to counts 1–3 under former section 1203.066, subdivision (a)(9).[26]  Because vacating the findings would have no effect on Haldeman's eligibility for probation or his sentence, doing so would be an idle act, and "[t]he law neither does nor requires idle acts." (Civ. Code, § 3532; see *People v. Financial Casualty & Surety, Inc.* (2016) 2 Cal.5th 35, 48 ["the law does not require idle acts"]; *People v. Coelho* (2001)

---

[26]    The probation report stated that Haldeman was ineligible for probation because he was "convicted of committing a violation of Section 288 or 288.5 against more than one victim," "in violating Section 288 or 288.5, [he had] substantial sexual conduct with a victim who is under 14 years of age," and "in violating Section 288 or 288.5, [he] used obscene matter, as defined in Section 311, or matter, as defined in Section 311, depicting sexual conduct, as defined in Section 311.3," and the trial court found that he was ineligible for the exception under former section 1203.066, subdivision (c)(1) because he was not the "victim's natural parent, adoptive parent, stepparent, relative, or . . . a member of the victim's household."  (Former section 1203.066, subds. (a)(7), (a)(8), (a)(9), (c)(1)).)

89 Cal.App.4th 861, 889 ["[R]eviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance"].)

### 19. The Minute Order of May 10, 2021 Need Not Be Corrected

Finally, Haldeman argues that the minute order of May 10, 2021 must be corrected, because it reflects that the jury found true the allegation with respect to count 16 that the he "had substantial sexual conduct with Garrett Doe, a child under the age of 14 years" under former section 1203.066, subdivision (a)(8), whereas the jury actually found that allegation not true. But as the Attorney General notes, the prosecutor brought this issue to the trial court's attention at sentencing, at least with with respect to the same error contained in the probation report. Haldeman does not argue that the error in the minute order had any effect on his eligibility for probation or his sentence. Again, because correcting the minute order would be an idle act, we will decline Haldeman's invitation to do so. (See Civ. Code, § 3532; *People v. Financial Casualty & Surety, Inc.*, *supra*, 2 Cal.5th at p. 48; *People v. Coelho*, *supra*, 89 Cal.App.4th at p. 889.)

### DISPOSITION

The judgment is affirmed.

_____

                    RICHMAN, ACTING P.J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A166803)